JUDGE CROTTY

SANJAY WADHWA
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION 13 CV 2010
New York Regional Office
3 World Financial Center
Room 400
New York, New York 10281
(212) 336-0181

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                          :

SECURITIES AND EXCHANGE COMMISSION,    :

                         Plaintiff,    :

                                   :    COMPLAINT

   -against-                    :

                                 :    ECF CASE

MATTHEW G. TEEPLE,    :
DAVID T. RILEY,    :
  and    :
JOHN V. JOHNSON,    :

                            :

                    Defendants.    :
------------------------------------------------------------------------x

RECEIVED
MAR 2 6 2013
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Matthew G. Teeple ("Teeple"), David T. Riley ("Riley"), and John V. Johnson

("Johnson") (collectively, the "Defendants"), alleges as follows:

## SUMMARY

1.    This case concerns insider trading in the securities of Foundry Networks, Inc.

("Foundry") in advance of the July 21, 2008 announcement that Brocade Communications

Systems, Inc. ("Brocade") had agreed to purchase Foundry for approximately $3 billion (the

"July 21 Announcement").

2.    During the week leading up to the July 21 Announcement, Foundry's chief

information officer, Riley, tipped his friend and former colleague, Teeple, an analyst at a San

Francisco-based investment adviser that manages multiple hedge funds ("Investment Adviser A"), about Brocade's impending acquisition of Foundry. On at least one prior occasion, Teeple had given Riley investment advice and Riley had traded based on such advice.

3.      After receiving this material nonpublic information from Riley, Teeple conveyed Riley's information to a colleague at Investment Adviser A, who traded Foundry securities on behalf of Investment Adviser A's hedge funds. Teeple also conveyed the inside information to Johnson, a then-unemployed investment professional, and to numerous other former colleagues, associates, and friends, all of whom purchased Foundry securities in advance of the July 21 Announcement.

4.      After the July 21 Announcement, Foundry's stock price shot up to $18.08 per share, an increase of $4.42, or approximately 32 percent, over the previous day's close of $13.66 per share, and Investment Adviser A's hedge funds generated profits and avoided losses of more than $21 million. In addition, Johnson reaped approximately $136,000 by purchasing Foundry equities and options, and short selling Brocade equities. Teeple's numerous other tippees generated additional trading gains of at least $1.1 million.

5.      Riley also provided material nonpublic information to Teeple in advance of at least two other Foundry announcements in 2008. In early April 2008, Riley tipped Teeple in advance of Foundry's April 11, 2008 announcement that it expected profits for the first quarter of 2008 to be well below Wall Street analysts' expectations. And, in mid-October, 2008, Riley tipped Teeple in advance of Foundry's October 24, 2008 announcement that "recent developments related to the [Brocade] transaction" had caused it to delay its shareholder vote to approve the acquisition. In both instances, Teeple conveyed this material nonpublic information

2

to his colleagues at Investment Adviser A, who traded Foundry securities on behalf of
Investment Adviser A's hedge funds and reaped combined profits of approximately $6.9 million.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6.     The Commission brings this action pursuant to the authority conferred upon it by
Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section
21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].  The
Commission seeks permanent injunctions against each of the Defendants, enjoining them from
engaging in the transactions, acts, practices, and courses of business alleged in this Complaint,
disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this
Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the
Exchange Act [15 U.S.C. § 78u-1].  In addition, pursuant to Section 20(e) of the Securities Act
[15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], the
Commission seeks an order barring Riley from acting as an officer or director of any issuer that
has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]
or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §
78o(d)].  Finally, the Commission seeks any other relief the Court may deem appropriate
pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and
22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e),
and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8.     Venue lies in this Court to Sections 20(b) and 22(a) of the Securities Act [15
U.S.C. §§ 77t(b) and 77v(a)], and Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C.

§§ 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. For example, Investment Adviser A utilized a New York, New York-based prime broker for clearing and settling the illegal trades in the securities of Foundry. In addition, certain of Investment Adviser A's illegal trades were executed on exchanges based in New York, New York. For example, certain of Investment Adviser A's Foundry options trades were executed on the New York Stock Exchange in New York, New York and on the International Securities Exchange in New York, New York.

## DEFENDANTS

9.      **Teeple,** age 41, resides in San Clemente, California. Since 2007, he has been an analyst at Investment Adviser A. Prior to joining Investment Adviser A, Teeple worked at a market research firm that provided investment-related information to mutual funds and hedge funds, including Investment Adviser A. Before joining the market research firm, Teeple had been a sales professional at multiple technology companies. He met Riley when they both worked at one of these companies.

10.     **Riley,** age 47, resides in San Jose, California. From 2005 until December 2008, when Brocade's acquisition of Foundry was completed, Riley was Foundry's chief information officer and vice president of information systems. He is currently the chief information officer of a publicly listed computer hardware design company based in Santa Clara, California.

11.     **Johnson,** age 46, resides in Arvada, Colorado, and is currently the chief investment officer of a state pension system. From 2002 until June 2008, Johnson was a senior

4

analyst and portfolio manager for an asset management firm in Denver, Colorado. The asset management firm was a client of the market research firm where Teeple worked before joining Investment Adviser A, and Johnson met Teeple through that relationship in approximately 2004. During the time of the insider trading alleged herein, Johnson was unemployed but traded securities in his and his family members' personal brokerage accounts. Johnson has held Series 7 and 63 licenses in the past.

## RELEVANT ENTITIES

12.     **Brocade,** a Delaware corporation headquartered in San Jose, California, is a technology company specializing in data and storage networking products. Brocade's securities are registered with the Commission pursuant to Section 12(g) of the Exchange Act, and its common stock is traded on the NASDAQ National Market under the symbol "BRCD."

13.     **Foundry** was a California-based networking hardware company that mainly sold Ethernet switches and routers. Foundry's securities were registered with the Commission pursuant to Section 12(g) of the Exchange Act and, until Brocade finalized its acquisition of Foundry on December 18, 2008, its common stock traded on the NASDAQ National Market under the symbol "FDRY."

14.     **Investment Adviser A,** a California limited partnership, is a registered investment adviser based in San Francisco, California. Investment Adviser A serves as the investment adviser of multiple hedge funds that have approximately $1.7 billion of assets under management.

## FACTS

15.     After the close of regular market trading on Monday, July 21, 2008, Brocade announced that it had signed a definitive merger agreement to purchase Foundry for a

combination of $18.50 in cash plus 0.0907 shares of Brocade stock for each share of Foundry stock. This combination represented a total acquisition price of $19.25 per share based on Brocade's closing share price on Friday, July 18, 2008. The day after the July 21 Announcement, the price of Foundry stock rose to $18.08 per share, an increase of $4.42 per share, or approximately 32 percent, over the previous day's close of $13.66 per share.

## Insider Trading in Advance of the July 21 Announcement

16.     Riley, Foundry's chief information officer, was made aware of Brocade's plans to acquire Foundry on or about July 1, 2008, and, during the subsequent three weeks, he was involved in Foundry's internal preparations for the July 21 Announcement.

17.     On the morning of July 16, 2008, during a conversation with Teeple, Riley tipped Teeple, his friend and former colleague, about Brocade's impending acquisition of Foundry. Following this conversation, Teeple shared this material nonpublic information with Investment Adviser A, Johnson, and numerous other business contacts and friends, all of whom purchased Foundry securities in advance of the July 21 Announcement.

18.     Shortly after talking to Riley, Teeple telephoned one of his colleagues at Investment Adviser A and relayed the information he had just received from Riley concerning Foundry's impending acquisition. At the outset of this telephone call, Investment Adviser A's hedge funds held a significant net short position[1] in Foundry equity and call options.[2] Only

---

[1] "Shorting" or "selling short" is the practice of selling a security that one does not own, but rather has arranged to borrow from a third party, with the intention of purchasing (also called "covering") the security at a later date to deliver to the lender. A short seller stands to gain if the price of the security declines between the short sale and the purchase/cover because the short seller has sold the security at a price that is greater than the purchase price. A "short position" is the result of net "shorting" or "selling short" in a security.

[2] A call option is a financial contract between two parties that gives the buyer the right, but not the obligation, to buy an agreed quantity of stock during a specified time period for a specified

minutes into the call, however, Investment Adviser A switched course and initiated a uniformly bullish strategy, buying Foundry shares in large quantities, covering its short position in Foundry call options, and further augmenting its long position by selling short Foundry put option contracts.[3]  Investment Adviser A continued this uniformly bullish trading strategy during the subsequent trading days leading up to the July 21 Announcement.

19.     After the July 21 Announcement, Investment Adviser A's hedge funds reaped profits of approximately $13.6 million from trading based on the material nonpublic information that Teeple had obtained from Riley.  In addition, Investment Adviser A's hedge funds avoided losses of approximately $7.4 million by covering their prior short positions in Foundry equities and call options.

20.     On July 16, 2008, roughly two hours after Teeple telephoned his colleague at Investment Adviser A, Teeple telephoned a friend ("Friend A").  Teeple informed Friend A that Foundry was going to be acquired soon, and that Friend A should buy Foundry securities.  About one hour after receiving this information, Friend A purchased 450 shares of Foundry stock in his personal account and purchased 850 shares in his mother's account.  Based on these purchases and additional purchases of Foundry securities that Friend A executed on July 17 and 21, 2008, Friend A obtained profits of approximately $41,000 following the July 21 Announcement.

21.     During the remainder of July 16, and on July 17, 2008, Teeple shared Riley's inside information with numerous other business contacts and friends or otherwise advised these

price, known as the strike price.  A buyer pays a fee, or premium, to purchase this right.  A short seller of a call option generally stands to gain if the price of the stock decreases.

[3] A put option is a financial contract between two parties that gives the buyer the right, but not the obligation, to sell an agreed quantity of stock during a specified time period for a specified price, known as the strike price.  A buyer pays a fee, or premium, to purchase this right.  A short seller of a put option generally stands to gain if the price of the stock increases.

7

individuals to purchase Foundry securities. Many of these individuals then, minutes or hours after communicating with Teeple, purchased Foundry securities in accounts they controlled and/or tipped others to purchase Foundry securities.

22.     On the morning of Friday, July 18, 2008, Teeple received a call from Johnson. During this telephone call, Teeple told Johnson that Foundry was going to be acquired by Brocade. Before this telephone call ended, Johnson purchased 3,900 Foundry shares in six separate family brokerage accounts that he controlled and 325 Foundry call option contracts in his personal trading account. A few minutes after his telephone call with Teeple ended, Johnson also sold short 1,200 Brocade shares based on the commonly held view that an acquiring company's share price often decreases following a merger announcement.

23.     As discussed in paragraph 15 above, the day after the July 21 Announcement, the price of Foundry stock climbed $4.42 per share, or approximately 32 percent. That same day, the price of Brocade stock, which had closed at $8.33 per share just before the July 21 Announcement, fell almost 22 percent to close at $6.50 per share on July 22, 2008. Johnson sold the Foundry securities he had acquired during his phone call with Teeple and covered the short position that he had established in Brocade equities and reaped trading profits of approximately $136,000.

**Additional Insider Trading Concerning the Foundry Acquisition**

24.     Following the July 21 Announcement, Riley continued to provide material nonpublic information to Teeple concerning key events leading up to the consummation of Brocade's acquisition of Foundry, which was not fully completed until December 18, 2008, and Investment Adviser A continued to profitably trade Foundry securities based on this inside information.

25. During September, October, and November, as conflicting information was being reported about the likelihood of Brocade completing its proposed acquisition of Foundry, Teeple and Riley remained in frequent communication.

26. As of October 16, 2008, Foundry's per share stock price was approximately $16.50, its shareholders were scheduled to vote to approve the Brocade acquisition on October 24, 2008, and Brocade had recently announced that it had entered into a $1.225 billion secured credit facility to finance a portion of the Foundry acquisition and would be raising up to $400 million in additional financing to fund the acquisition. Unbeknownst to the public, however, Foundry had learned from Brocade in early October 2008, that Brocade was having trouble securing the additional $400 million of financing required to complete the acquisition.

27. On the morning of October 16, 2008, Riley spoke to Teeple and tipped him that Brocade was having trouble completing its acquisition of Foundry. Following this conversation, Teeple called a colleague at Investment Adviser A, and, before the telephone call ended, Investment Advisor A's hedge funds began selling shares of Foundry stock in large quantities. By the end of regular trading on October 16, 2008, Investment Advisor A had sold its entire equity position in Foundry, which had comprised more than 1.1 million shares.

28. On the evening of October 16, 2008, Teeple spoke to Friend A by telephone and the two exchanged several text messages. Early the next morning, October 17, 2008, Friend A began selling the Foundry stock that he and his mother had held. By the close of regular trading on October 17, Friend A had sold a total of 5,600 shares of Foundry stock, which included all of the shares in his mother's account and all but 1,000 of the shares in his account. He sold the remaining 1,000 shares on the next trading day, October 20, 2008. In addition, and also on

9

October 17, 2008, Friend A purchased 55 put option contracts with a strike price of $15 and an expiration date of November 2008, betting that Foundry's per share stock price would decrease.

29.     Approximately one week later, on October 24, 2008, Foundry announced that the shareholder vote to approve the Brocade acquisition, which was scheduled for later that day, would be delayed until October 29 "given recent developments related to the transaction." Following this announcement, Foundry's stock price, which had closed at $17.04 per share the day before, plummeted to a low of $9.65 per share before closing at $12.67 per share. In selling its entire Foundry equity position after Teeple's October 16, 2008 conversation with Riley, Investment Adviser A's hedge funds avoided trading losses of at least $4.3 million.

30.     Based on his Foundry trading on October 17 and 20, 2008, Friend A obtained profits totaling approximately $11,000 from his options trading and avoided losses of approximately $29,000 from his selling of Foundry shares.

**Insider Trading In Advance of Foundry's April 2008 Earnings Forecast**

31.     The five-month period leading up to Brocade's ultimate acquisition of Foundry in December 2008 was not the first or only time that Riley tipped material nonpublic information to Teeple.

32.     On the morning of April 3, 2008, three days after the end of the company's first quarter, Riley called Teeple and informed him that Foundry's first quarter sales would not meet Wall Street analysts' expectations. Approximately ninety minutes later, Teeple called a colleague at Investment Adviser A. Prior to this telephone call, Investment Adviser A's hedge funds had been short selling Foundry put options, anticipating that Foundry's stock price would rise. Before this call ended, Investment Adviser A reversed its trading strategy and began short selling Foundry call options, now betting that Foundry's stock price would drop. Later that same

10

day and on the following day, April 4, 2008, hedge funds managed by Investment Adviser A

increased its bet that Foundry's stock price would drop by selling short more than 1.8 million

shares of Foundry stock.

33.     Prior to the open of regular market trading on April 11, 2008, Foundry announced

that it expected its profits for the first quarter to be well below Wall Street analysts' expectations

because of a drop in customer orders. Later the same day, Foundry's stock price, which had

closed at $11.59 per share on April 10, 2008, fell to as low as $11.04 per share and Investment

Adviser A's hedge funds reaped approximately $2.6 million in profits from the bearish Foundry

trades that they placed between April 3 and April 11, 2008.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against all Defendants)

34.     The Commission realleges and incorporates by reference paragraphs 1 through

33, as though fully set forth herein.

35.     The information that Riley tipped to Teeple was, in each case, material and

nonpublic. In addition, the information was, in each case, considered confidential by Foundry,

the company that was the source of the information, and Foundry had policies protecting

confidential information.

36.     Riley learned the material nonpublic Foundry information that he conveyed to

Teeple as a result of his service as the chief information officer at Foundry, and Riley knew,

recklessly disregarded, or should have known, that he owed a fiduciary duty, or obligation

arising from a similar relationship of trust and confidence, to Foundry and/or Foundry's

shareholders to keep the information confidential.

11

37.     Riley tipped material nonpublic information to Teeple in breach of the fiduciary duty that Riley owed Foundry and/or Foundry's shareholders, and did so with the expectation of receiving a benefit.

38.     Teeple knew, recklessly disregarded, or should have known, that Riley owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

39.     Teeple knew, recklessly disregarded, or should have known, that the material information that he received from Riley was disclosed or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust and confidence.

40.     Teeple tipped the material nonpublic information he received from Riley to Investment Adviser A, Johnson, Friend A, and numerous other business contacts and friends, with the expectation of receiving a benefit.

41.     Johnson knew that the information that he received from Teeple was material and nonpublic, and knew that such information was conveyed in breach of a fiduciary duty or obligation arising from a similar relationship of trust and confidence.

42.     Johnson traded Foundry and Brocade securities while in possession of the material nonpublic Foundry information that he received from Teeple.

43.     By virtue of the foregoing, Teeple, Riley, and Johnson, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts,

practices or courses of business which operated or would have operated as a fraud or deceit upon

persons.

    44.    By virtue of the foregoing, Teeple, Riley, and Johnson, directly or indirectly,

violated, and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**CLAIM II**
**Violations of Section 17(a) of the Securities Act**
**(Against all Defendants)**

    45.    The Commission realleges and incorporates by reference paragraphs 1 through

44, as though fully set forth herein.

    46.    By virtue of the foregoing, Teeple, Riley, and Johnson, in the offer or sale of

securities, by the use of means or instruments of transportation or communication in interstate

commerce or by the use of the mails, directly or indirectly: (a) employed devices, schemes or

artifices to defraud; (b) obtained money or property by means of an untrue statement of a

material fact or omitted to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and (c) engaged in

transactions, practices or courses of business which operate or would operate as a fraud or deceit

upon a purchaser.

    47.    By reason of the conduct described above, Teeple, Riley, and Johnson, directly or

indirectly, violated, and, unless enjoined, will again violate, Section 17(a) of the Securities Act

[15 U.S.C. § 77q(a)].

### RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

#### I.

Permanently restraining and enjoining defendants Teeple, Riley, and Johnson from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

#### II.

Permanently restraining and enjoining defendants Teeple, Riley, and Johnson from violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)];

#### III.

Ordering defendants Teeple, Riley, and Johnson to disgorge, with prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as a result of the conduct alleged in this Complaint, including, as to each of the Defendants, their own illicit trading profits, other ill-gotten gains, and/or losses avoided, and, on a joint and several basis, the illicit trading profits, other ill-gotten gains, and/or losses avoided of their direct and downstream tippees;

#### IV.

Ordering defendants Teeple, Riley, and Johnson to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

#### V.

Barring defendant Riley, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an

officer or director of any issuer that has a class of securities registered pursuant to Section 12 of

the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of

the Exchange Act [15 U.S.C. § 78o(d)]; and

## VI.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      March 26, 2013

*Sanjay Wadhwa*
_____
Sanjay Wadhwa
Senior Associate Director
Attorney for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0181
Wadhwas@sec.gov

Of Counsel:

Joseph G. Sansone (Sansonej@sec.gov)
Michael P. Holland (Hollandm@sec.gov)
William Edwards (Edwardsw@sec.gov)